[Nos. D013457, D014092. Fourth Dist., Div. One. Dec. 17, 1992.]

COCA COLA BOTTLING COMPANY OF SAN DIEGO, Plaintiff, Cross-defendant and Respondent, v. COLUMBIA CASUALTY INSURANCE CO., Defendant, Cross-complainant and Appellant; CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Cross-defendant and Respondent.

## COUNSEL

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Richard J. Elliott, Virginia R. Gilson, Ross, Dixon & Masback and Barbara E. Etkind for Defendant, Cross-complainant and Appellant.

Patrick A. McCormick, Jr., and Linda B. Zappe for Plaintiff, Cross-defendant and Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Patricia & Mundy and Alan E. Greenberg for Cross-defendant and Respondent.

## OPINION

**BENKE, Acting P. J.**—In this case we affirm summary judgments entered in favor of Coca Cola Bottling Company of San Diego (Coca Cola) and the California Insurance Guarantee Association (CIGA) and against Columbia Casualty Insurance Co. (Columbia). Like the trial court, we find Columbia's excess liability policy "drops down" to cover a risk for which an insolvent

insurer had issued a policy. As we explain in greater detail below, we believe this outcome is mandated by two Supreme Court opinions, *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 814 [180 Cal.Rptr. 628, 640 P.2d 764] (*Pisciotta*) and *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*).

## FACTUAL AND PROCEDURAL HISTORY

### 1. *The Policies*

Coca Cola is a wholly owned subsidiary of Beatrice Company (Beatrice). In late 1984 Beatrice purchased Esmark, Inc. (Esmark). For the calendar year beginning October 1, 1984, Esmark purchased a series of insurance policies which provided Esmark with $200 million in general liability coverage. As of March 1, 1985, Beatrice and its subsidiaries, including Coca Cola, became the named insureds under the Esmark policies.

Beatrice/Esmark's primary level of insurance was provided by Northwestern National Insurance Company (Northwestern). The Northwestern policy had a $1 million per occurrence deductible and a $1 million limit per occurrence in coverage for automobile claims. The next level of coverage was provided by Mission National Insurance Company (Mission). Mission provided an umbrella policy which covered claims up to $5 million per occurrence and in the aggregate. The third level of coverage was provided by Columbia which provided coverage for claims in excess of those covered by the Mission policy up to a limit of $10 million and $5 million in the aggregate. Liability for claims which exceeded the limits of the Northwestern, Mission and Columbia policies was provided by a host of other insurers.

### 2. *The Johnson Claim*

On August 12, 1985, Linda Johnson and her three minor daughters filed a complaint in superior court for personal injuries arising out of a collision with a truck owned by Coca Cola. Coca Cola tendered defense of the Johnson complaint to the carriers who provided liability coverage to Beatrice/Esmark under the October 1, 1984, policies.

In 1989 Coca Cola settled the Johnsons' claims by agreeing to pay the Johnsons $1,850,000.

### 3. *The Instant Proceedings*

While the Johnson claim was pending against Coca Cola, Mission declared insolvency. On August 3, 1988, Coca Cola filed the instant declaratory relief action in which it sought a determination Columbia was required

to "drop down" into Mission's place and cover the portion of any judgment in the Johnson litigation over $1 million.

In response Columbia filed a cross-complaint against Coca Cola and CIGA. Columbia's cross-complaint alleged its coverage had not been invaded by Mission's insolvency and that the excess over $1 million was covered by Northwestern, Coca Cola or CIGA. Later Columbia filed an amended cross-complaint in which Columbia alleged its policy should be rescinded because of misrepresentations about the toxic shock syndrome risks associated with tampons produced by Playtex, Inc. (Playtex), another Beatrice/Esmark subsidiary.

Coca Cola moved for summary judgment in early 1989. In its motion Coca Cola argued as a matter of law Columbia was liable for the amounts left uncovered by Mission's insolvency. Coca Cola's initial motion was continued while the parties conducted discovery. Later in February 1990 Coca Cola filed an additional motion for summary adjudication in which it argued Columbia was not entitled to rescission because any fraud with respect to the potential liability posed by tampons was severable from the automobile coverage provided for the Johnson claim.

In March 1990 the trial court finally heard argument on Coca Cola's motions. The trial court advised the parties it intended to grant both of Coca Cola's motions. Orders granting the motions were entered on June 25, 1990, and judgment in favor of Coca Cola was entered on October 30, 1990. Columbia filed a timely notice of appeal.

On April 12, 1990, CIGA filed a motion for summary judgment in which it argued the judgment in favor of Coca Cola disposed of all of Columbia's claims against CIGA. Columbia opposed the motion. The trial court granted the motion, and judgment in CIGA's favor was entered on January 25, 1991. Columbia filed another timely notice of appeal and we consolidated both of Columbia's appeals.

### ISSUES ON APPEAL

On appeal Columbia argues there is no language in its policy which requires that it bear the risk of a primary insurer's insolvency. Columbia contends that without such language, Columbia should not have been required to "drop down" and cover a risk insured by Mission.

In the alternative Columbia argues the trial court erred in finding the automobile coverage, under which the Johnson claim was made, was separate from the product liability coverage provided for the Playtex tampons.

DISCUSSION

I

A. *Pisciotta*

As we indicated above, we believe the "drop down" issue is governed by the holdings in *Pisciotta* and *AIU*. As here, in *Pisciotta* a primary insurer, Reserve, became insolvent, and the insured argued coverage provided by an excess insurer, CNA, was triggered. The CNA policy considered in *Pisciotta* stated: " 'Section II . . . The Company [CNA] shall only be liable for the ultimate net loss in excess of either: . . . 1. the *amount recoverable* under the underlying insurance as set out in the schedule of the underlying insurance; or 2. 20% of the ultimate net loss or $200 ultimate net loss whichever is lesser in respect of each occurrence not covered by said underlying insurance.' " (*Pisciotta, supra,* 30 Cal.3d at p. 812, italics added.)

In determining whether "drop down" was required by these policy provisions, the Supreme Court stated: "It is axiomatic that absent a violation of public policy, a statute, or a constitutional provision, the parties to a private agreement may allocate risks in any manner they may choose. For this reason, we . . . ask whether the wording of the CNA policy requires CNA to provide the coverage that Reserve would have assumed had it not become insolvent. CNA assumed liability for any excess over the 'amount recoverable' under the underlying policy. That language might possibly be interpreted either to expose CNA only for amounts over the dollar limits of the underlying insurance or to expose CNA for amounts which the insured is not able to actually recover from the underlying insurer because of its insolvency. Because there are two meanings which may reasonably be attributed to the term in question, it is ambiguous and under settled principles must be construed in favor of the insured. Reserve is now insolvent, so the 'amount recoverable' from Reserve is something substantially less than the Reserve policy limit of $100,000. We therefore conclude that the CNA policy includes the risk of Reserve's insolvency within the scope of its coverage, CNA must reimburse Pisciotta for the first $100,000 of his liability in addition to any amounts over $300,000." (*Pisciotta, supra,* 30 Cal.3d at pp. 814-815, fn. omitted; see also *Span* v. *Associated Internat. Ins. Co.* (1991) 227 Cal.App.3d 463 [277 Cal.Rptr. 828].)

B. *Policy Provisions*

■ Under *Pisciotta,* it is plain we must initially examine the language of the Columbia policy to determine which party—Coca Cola or Columbia—assumed the risk of Mission's insolvency.

As Coca Cola points out, the Columbia excess policy "follows form"; that is, except for the amount of premium and policy limits, the terms and conditions of the Columbia policy are the same as the terms and conditions of the underlying Mission policy.[1] Section III, entitled "Limits of Liability," of the Mission policy in turn states: "The company shall be liable for $5,000,000 ultimate net loss . . . in excess of: (1) The amount recoverable under the underlying insurance set forth under Schedule A or any renewals or replacements thereof under Coverage A . . . ."

As Coca Cola interprets these policy provisions, under the "following form" endorsement in the Columbia policy the risk of Mission's insolvency must be governed by section III of the Mission policy. Because, like the language used in *Pisciotta*, section III would make Columbia liable for amounts in excess of the "amount recoverable" under underlying policies, Coca Cola argues that under *Pisciotta* Columbia therefore expressly assumed the risk of Mission's insolvency. Columbia, on the other hand, argues section III of the Mission policy does not apply to the Columbia policy, and, that even if it did, *Pisciotta* does not require that Columbia "drop down." We agree with Coca Cola's interpretation.

### 1. *Section III of the Mission Policy*

In arguing section III of the Mission policy does not govern coverage under its policy, Columbia points out section III refers to *underlying* policies set forth in schedule A of the Mission policy. Since Columbia's coverage was in *excess* of the limits of the Mission policy, Columbia is not listed as an underlying insurer in schedule A of the Mission policy. According to Columbia, this fact makes it plain the policy drafters did not intend that section III of the Mission policy would define the coverage provided by the Columbia policy.

The fundamental difficulty with Columbia's argument is that it requires that Mission bear risks without imposing similar risks on insurers whose coverage is in excess of Mission's coverage. Such a disparate risk allocation between primary and excess carriers is inconsistent with the "followed form" nature of the insurance Columbia provided. "An excess policy generally

[1]The "following form" endorsement in the Columbia policy states: "Endorsement No. 2 of this policy is deleted and replaced in its entirety by the following: 'It is understood and agreed that, effective March 1, 1985, the terms and conditions of this policy, including all prior endorsements, except with regard to amount of insurance (limits) and premium, are deleted and replaced in their entirety by the terms and conditions of the underlying Mission National Insurance Policy No. MN 037126, as amended by endorsement amending certain provisions of Mission National Insurance policy No. MN 037126 (effective March 1, 1985).'"

follows the form of the underlying primary coverage and is called 'following form' excess coverage, i.e., *the excess has the same scope of coverage as the primary policy.*" (1 Cal. Liability Insurance Practice: Claims & Litigation (Cont.Ed.Bar 1991) § 1.5, p. 1-5, italics added.) Indeed as Columbia's brief itself states: "[A]ll form negotiations were with the lead umbrella [Mission]. Once Esmark came to an agreement with the lead umbrella carrier, Esmark only accepted follow form excess policies."

Moreover, contrary to Columbia's argument, we have little difficulty interpreting section III of the Mission policy as an operative part of the Columbia policy. In doing so we are guided by familiar principles of contract construction: under Civil Code section 1641, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"; under Civil Code section 1642, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together."

Here, while the Columbia policy states a lower limit of $5 million, this monetary limit is followed by the sentence: "CSL each occurrence and annual aggregate *where applicable excess of primaries.*" (Italics added.)[2] The Columbia policy does not itself explain when the monetary limit is applicable or define the term "primaries." This lack of amplification is not surpising given the fact the Columbia policy "followed form." Following form policies "are typically written on the same terms and conditions as the coverage provided by the underlying primary coverage. They are generally short, consisting of one or two pages, with an endorsement or provision that incorporates by reference the underlying policy coverages, except for the premium, the liability limits, and the obligation to investigate, defend, or pay costs of defense." (2 Cal. Liability Insurance Practice: Claims and Litigation (Cont.Ed.Bar 1991) § 17.3, p. 17-5.)

Because the Columbia policy does not itself fully define the lower limits of its coverage, reference to the terms of the Mission policy is necessary. (Civ. Code, §§ 1641, 1642.) This of course brings us back to the limits of liability provision of the Mission policy, section III, which, if we view Mission as an underlying insurer, does define when the lower monetary limits of the Columbia policy are applicable. As we have seen section III

---

[2]The limits of liability in the Columbia policy are stated as follows on the declarations page: "$10,000,000. CSL each occurrence and annual aggregate where applicable excess of $5,000,000. CSL each occurrence and annual aggregate where applicable excess of primaries."

defines the lower limit of insurance as the "amount recoverable" on underlying insurance.

In sum then, contrary to Columbia's argument, we believe section III of the Mission policy defines Columbia's coverage: the "follow form" nature of the Columbia policy requires that Mission and the other excess carriers confront similar risks and as a practical matter the Columbia policy cannot be interpreted without reference to section III of the Mission policy.

## 2. *"Drop Down" Is Required Under Pisciotta*

As we have seen, the language used in section III of the Mission policy, "ultimate net loss . . . in excess of the amount recoverable under the underlying insurance," is nearly identical to the language the court in *Pisciotta* found requires a "drop down" in coverage. (See *Pisciotta, supra,* 30 Cal.3d at p. 812.) Notwithstanding the similarity with the language considered in *Pisciotta,* Columbia nonetheless contends that even if its coverage is governed by section III, "drop down" is not required as a result of Mission's insolvency.

### a. *Out-of-state Authority*

First Columbia relies on a number of out-of-state cases which have found that where lower monetary limits are stated in the declarations page of an excess policy, "drop down" is not required upon the insolvency of an underlying insurer. (See e.g., *Radiator Specialty Co.* v. *First State Ins. Co.* (W.D.N.C. 1987) 651 F.Supp. 439, affd. (4th Cir. 1987) 836 F.2d 193; *Rapid City Regional Hospital, Inc.* v. *South Dakota Ins. Guaranty Assn.* (S.D. 1989) 436 N.W.2d 565, 566; *Werner Industries, Inc.* v. *First State Ins. Co.* (1988) 112 N.J. 30 [548 A.2d 188, 191]; *Wurth* v. *Ideal Mut. Ins. Co.* (1987) 34 Ohio App.3d 325 [518 N.E.2d 607, 612].) In our view those cases cannot be reconciled with *Pisciotta.*

The out-of-state cases Columbia cites give little, if any, weight to the specific language a policy employs in defining its own limits. Instead, the cases attempt to discern the reasonable expectations of an insured from the declarations page of the policy as well as the circumstances surrounding issuance of the policy. (See e.g. *Werner Industries, Inc.* v. *First State Ins., Co., supra,* 548 A.2d at 191-192.) *Pisciotta,* on the other hand, requires we look to the specific language in a policy which describes the limits of coverage. (*Pisciotta, supra,* 30 Cal.3d at pp. 807-808; 2 Cal. Liability Insurance Practice: Claims & Litigation, *supra,* § 17.20, pp. 17-18.; see also *Span, Inc.* v. *Associated Internat. Ins. Co., supra,* 227 Cal.App.3d at pp.

474-478.) Thus, with due respect, we are not in a position to follow the contrary out-of-state authority Columbia relies upon. (See *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

### b. *Beatrice/Esmark's Bargaining Position*

Secondly, Columbia points out the court in *Pisciotta* found the term "amount recoverable" ambiguous and then construed it in favor of the insured under settled principles of interpretation in insurance cases. (*Pisciotta, supra,* 30 Cal.3d at p. 815.) Columbia argues those principles of construction have no bearing here because the record demonstrates that, unlike the typical insured who must accept or reject a policy presented by an insurer, Beatrice/Esmark in fact had enough negotiating power to put its insurers in the somewhat unusual position of accepting or rejecting policy language proposed by Beatrice/Esmark. Given the fact the policy provisions were proposed by Beatrice/Esmark, Columbia argues that in this case the ambiguous term "amount recoverable" should be construed in Columbia's favor. This argument brings us to the opinion in *AIU.*

In *AIU* the court was called upon to determine whether comprehensive general liability (CGL) policies provide coverage for cleanup and other "response" costs incurred pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C § 9601 et seq.) and related state and federal environmental laws. The insured in *AIU* was FMC Corporation (FMC), a large corporation which held over 60 primary and excess policies issued by a group of insurers. In this context the court in *AIU* set forth the usual principles which govern insurance policy interpretation: "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]

"If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.] In the

insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage." (*AIU, supra,* 51 Cal.3d at pp. 821-822, fn. omitted.)

Like Columbia, the insurers in *AIU* argued these rules of policy interpretation should not be applied in FMC's favor. In rejecting this argument, the court stated: "FMC unquestionably possesses both legal sophistication and substantial bargaining power. For this reason, the insurers contend, we should neither construe the policy language at issue in this case in the broad sense understood by laypersons (as opposed to a narrower technical sense) nor resolve ambiguities in favor of coverage. There is some force to these arguments, particularly in light of the fact that FMC itself operates a subsidiary that drafts CGL policies identical to those at issue in this case. In the absence of evidence that the parties, at the time they entered into the policies, intended the provisions at issue here to carry technical meanings and implemented this intention by specially crafting policy language, however, we see little reason to depart from ordinary principles of interpretation. Similarly, in the absence of evidence that the insurers had cause to believe, at the time of formation, that FMC understood policy language in any technical or restrictive manner, we decline to depart from the settled rule that ambiguities are resolved against the party responsible for their inclusion in the policies.

"We deem this party to be the insurers. They have presented no evidence suggesting that *the provisions in question* were actually negotiated or jointly drafted. [Citations.] Indeed, the evidence that is before us reveals that such provisions, drafted by the insurers, are highly uniform in content and wording. For the above reasons, we interpret their contents, if ambiguous, in favor of coverage." (*AIU, supra,* 51 Cal.3d at pp. 823-824, fn. omitted, italics added.)

As we interpret *AIU*, an insured's bargaining position is important and will alter the usual rules of policy interpretation, but only if it can be demonstrated the insured's bargaining power was brought to bear in creating the particular language in dispute. Indeed, although the insurers in *AIU* presented evidence of FMC's vigorous participation in negotiating policy

terms, the court found the evidence insufficient to alter the rules of interpretation with respect to the particular issues raised in the case: "The insurers have submitted evidence (specifically, an internal FMC memorandum stating that the policies were written 'on a line-per-line basis through continuing negotiation with the insurance carrier') that FMC individually negotiated the policies in question. This evidence does not, however, shed light on the meaning to be ascribed to the *coverage provisions at issue here.* These provisions, as we have noted above, are adopted verbatim from standard form policies used throughout the country. For this reason, even if the policies were 'negotiated' in a broad sense, this fact has little bearing on construction of the specific policy language in question here." (*AIU, supra,* 51 Cal.3d at p. 823, fn. 9, italics added; compare *Garcia* v. *Truck Ins. Exchange* (1984) 36 Cal.3d 426, 434-438 [204 Cal.Rptr. 435, 682 P.2d 1100] [insured represented by large association which enjoyed substantial bargaining power vis-à-vis insurer and disputed language was inserted in direct response to concerns raised by association].)

Here, there is no evidence in the record the disputed "amount recoverable" language was specifically tailored by Beatrice/Esmark or the subject of specific negotiation between Beatrice/Esmark and Mission or between Beatrice/Esmark and the excess carriers. Indeed, according to Columbia itself, there is no extrinsic evidence any of the parties considered the risk of an underlying insurer's insolvency when they negotiated the Mission policy or any of the excess polices.

Moreover, the limit of liability language used in the Mission policy is almost identical to the language employed by the insurer in *Pisciotta,* as well as the insurer in *Donald B. MacNeal, Inc.* v. *Inter. Fire & Cas.* (1985) 132 Ill.App.3d 564 [477 N.E.2d 1322, 1324], which adopted the reasoning of *Pisciotta.* This of course strongly suggests that here, as in *AIU,* the disputed policy language originated in a standard form policy used throughout the country. Given these circumstances, it is difficult to accept the notion Beatrice/Esmark was somehow responsible for creation of an ambiguity which in all likelihood the insurance industry itself generated.

In sum then, we do not believe we are free to depart from the holding in *Pisciotta.* As in *Pisciotta,* we find use of the term "amount recoverable" shifted the risk of Mission's insolvency to Columbia and the other excess carriers.

## II

In its cross-complaint Columbia alleges its policy was obtained by fraud and therefore is void. This claim is based on misrepresentations

Beatrice/Esmark allegedly made with respect to the toxic shock syndrome risks associated with tampons produced by Playtex.

The trial court found the products liability coverage was separate from the automobile coverage under which the Johnson claim was made and therefore any fraud with respect to the Playtex tampons did not relieve Columbia of its liability. We agree with the trial court.

We have not been able to find a great deal of California authority with respect to when the various provisions of an insurance policy may be treated separately so that fraud with respect to one risk will not affect the enforceability of remaining insurance. Nonetheless, we believe the result here is governed by the holding in *Wilkinson* v. *Standard Acc. Ins. Co.* (1919) 180 Cal. 252, 259-260 [180 P. 607] (*Wilkinson*). In *Wilkinson* a widow attempted to recover on an accidental death policy obtained by her husband. The policy insured both the life of the widow and the decedent's life. On the application the husband misrepresented his wife's age. In finding this fraud did not affect coverage for the husband's death, the Supreme Court stated: " 'With reference to the . . . alleged false warranty [as to the wife's age], the policy provided as an additional benefit for a limited insurance in favor of the beneficiary if such person was over the age of eighteen years and under the age of sixty. It is true that courts have generally held a warranty as to age of the insured to be material. Here, however, the policy, as plaintiff contends, is separable into two distinct contracts of insurance, one insuring the deceased, the other insuring the plaintiff herself. Any misrepresentation respecting the beneficiary could in no manner have any effect upon the contract insuring deceased. The false statement here made was therefore a matter not material to the contract of insurance of deceased, and had nothing do with it.' "[3] (*Id.* at pp. 259-260.)

As in *Wilkinson*, here the coverage for products liability and automobile liability in reality amounted to separate contracts of insurance. In particular we note section III of the Mission policy set forth three separate and distinct limits of liability: "A. With respect to ultimate net loss arising out of other than automobile liability, toxic shock syndrome, workers' compensation, and employer's liability: . . . B. With respect to ultimate net loss arising out of Toxic Shock Syndrome: . . . C. With respect to ultimate net loss arising out of automobile liability, workers compensation and/or employers' liability." Moreover, although the policy states an aggregate limit for toxic shock syndrome and the other coverages, no aggregate limit is set for automobile

---

[3]With respect to the false warranty issue, the Supreme Court adopted the opinion of the District Court of Appeal.

liability. We also note that each of the various risks was rated separately by the insurers in calculating the total premium they would charge. The separate limits and separate rating are strong evidence the parties considered the risks of each coverage separately and bargained separately with respect to each.

Finally, and perhaps most importantly, we note the unique nature of the insurance Beatrice/Esmark obtained: it covered the risks created by a conglomerate of companies engaged in a myriad of activities. Unless the various coverages can be treated as separate contracts of insurance, Beatrice/Esmark would be forced to litigate the truthfulness of statements supplied by each of its subsidiaries when *any* claim is made on the policy. ■ As a practical matter this possibility would largely deprive Beatrice/Esmark of any benefit under the policy.[4]

■ Because the products liability coverage was, in reality, a separate contract of insurance, any misrepresentations with respect to toxic shock syndrome did not affect Columbia's liability on the Johnson automobile claim.

Judgments affirmed.

Froehlich, J., and Nares, J., concurred.

A petition for a rehearing was denied January 7, 1993, and appellant's petition for review by the Supreme Court was denied March 11, 1993. Panelli, J., was of the opinion that the petition should be granted.

---

[4]The result we reach is entirely consistent with the holdings in *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 180-181 [243 Cal.Rptr. 639] and *Old Line Life Ins. Co. v. Superior Court* (1991) 229 Cal.App.3d 1600, 1604-1605 [281 Cal.Rptr. 15]. Those cases hold, and we agree, that the materiality of a misrepresentation in an insurance application is to be judged on a subjective basis from the perspective of the insurer and that false statements on an application will permit rescission of an insurance contract even if, later, the insured believes his false statement is unrelated to the particular risk which gave rise to his claim. (See Ins. Code, § 334.) Here, however, we deal with the broader problem discussed in *Wilkinson*: under what circumstances should we treat one policy as creating two or more entirely separate contracts of insurance.