123 Cal.Rptr.2d 512 (2002)
100 Cal.App.4th 776
Fareed CASSIM et al., Plaintiffs and Respondents,
v.
ALLSTATE INSURANCE COMPANY, Defendant and Appellant.
No. B139975.
Court of Appeal, Second District, Division Seven.
July 29, 2002.
Rehearing Denied August 14, 2002.
Review Granted October 30, 2002.
*514 Horvitz & Levy, Peter Abrahams and Nina E. Scholtz; Pollak, Vida & Fisher, Michael M. Pollak and Lawrence J. Sher, Los Angeles, for Defendant and Appellant.
Law Offices of Ian Herzog, Evan D. Marshall, Ian Herzog and Amy Ardell, Santa Monica, for Plaintiffs and Respondents.
*513 MUNOZ, J.[*]
After a 33-day trial, appellant, Allstate Insurance Company (Allstate), was found to have breached the covenant of good faith and fair dealing in its handling of a claim made by respondents Fareed and Rashiba Cassim (Cassims). The jury specifically rejected contentions that: (1) the Cassims had submitted false claims to Allstate; and (2) the Cassims had intentionally set fire to their own home. The total amount of the judgment is $9,873,330, which includes $5 million in punitive damages. Additionally, respondents were awarded attorneys fees pursuant to Brandt v. Superior Court (1985) 37 Cal.3d 813, 210 Cal.Rptr. 211, 693 P.2d 796 in the sum of $1,193,533. Because of attorney misconduct in arguments to the jury, we reverse the judgment and remand the case for a new trial.

*515 FACTS

In accordance with the normal rules for appeal, we view the judgment in the light most favorable to the prevailing party. (Las Palmas Associates v. Las Palmas Center Associates (1991) 235 Cal.App.3d 1220, 1230, 1 Cal.Rptr.2d 301.) In 1989 the Cassims purchased a home in Palm-dale for $173,690. Allstate subsequently issued a homeowner's policy to the Cassims on the residence. In December 1990, an arson fire caused significant damage to the Cassims' residence. Even though the entire residence had been damaged by heat, smoke and water, the only damage caused by the fire was to the bed in the master bedroom, the refrigerator and the adjacent cabinets in the kitchen.
The insurance policy issued by Allstate covered three kinds of losses: dwelling repair, contents replacement or repair and additional living expenses. After an Allstate agent visited the residence and determined the residence was uninhabitable, the agent gave Mrs. Cassim a $10,000 advance for additional living expenses (ALE) and to purchase items such as clothing and personal property.
Allstate assigned the claim to an outside adjusting service, Frontier, to investigate the Cassims' financial condition and the cause of the fire. On December 18, 1990, the Frontier adjuster inspected the residence and determined the extent of the necessary dwelling repairs. He then negotiated with various contractors and subsequently arrived at a price of $35,400 for dwelling repairs. Another Frontier adjuster inspected the contents of the residence and noted that many personal items seemed to be missing.
Because their residence was uninhabitable, the Cassims moved into a Hollywood motel. However, they did not keep any of the motel receipts. On January 3, 1991, the Cassims used part of the ALE advance to make their mortgage payment. Later that month, the Cassims hired a public adjuster, Anthony Thompson (Thompson), who obtained a dwelling repair estimate of $88,000. Allstate rejected the estimate as being inflated and including unnecessary work. Attempts to compromise were unsuccessful. Thompson's request for $35,400, the undisputed portion of the dwelling repair claim was denied by Allstate. Thompson then demanded an independent appraisal because he believed $35,400 was inadequate to repair the house.
In March 1991, the Cassims submitted a proof of loss in the amount of $44,180, which they claimed to be the replacement value for the contents of the home. Allstate rejected that claim because the origin of the loss was still under investigation and there was a lack of adequate documentation to support the claim.
In April 1991, Allstate had Mr. Cassim examined under oath (EUO). Mr. Cassim, whose native language is Farsi, rejected the use of an interpreter and testified that some of the items on the proof of loss had values much lower than those claimed. Mrs. Cassim's EUO was taken on June 21, 1991.
In July 1991 with foreclosure looming, the Cassims accepted Allstate's offer of $34,500 for the dwelling repairs. After the initial $10,000 advance, Allstate refused further advances for ALE and was unwilling to settle for anything more than $7,000. The Cassims rejected that offer and demanded $30,000. Allstate did not respond to the demand. In November 1991 the Cassims filed for bankruptcy. In December 1991 the present action for breach of the covenant of good faith and fair dealing, was filed by the Cassims against Allstate. The Cassims lost their *516 home through foreclosure in February 1992.
After an initial mistrial, a jury in 1999 found: (1) the Cassims had not set the fire, (2) the Cassims had not made material misrepresentations in their claim; and (3) that Allstate had violated the covenant of good faith and fair dealing. The jury further found Allstate had acted with oppression, fraud or malice and awarded punitive damages. This appeal followed.

I. Plaintiffs' Counsel Committed Prejudicial Error By Implying That Some Of The Jurors Were Guilty Of Low Level Fraud And The Court Approved Of This Conduct

A. The trial court's procedure for employed jurors when court was not in session.
At trial, on days when the jury was not in session, the court adopted an unusual procedure. Jurors who were employed could show up in the courtroom, sign in and then leave for the day without having to return to work. The court did this at least twice and possibly a third time.
In the first instance, on Monday, October 25, 1999, the court stated: "And we'll reconvene then on Wednesday at 8:45 a.m., all right, for a full day, for a full day. [¶] Okay. We'll see you Wednesday. Only those who want to get credit, come tomorrow."
On the next Wednesday, October 27, 1999, the court once again recessed for the following day and instructed the jurors: "No court tomorrow. But, I'm going to allow you to come in and have credit. And, we'll pick up on Friday morning, [¶] ... [¶] Don't form any opinions, and we'll see you Friday. But if you come in tomorrow, you'll get credit."
The court's comments reveal the jurors were not required to be in court on days when court was not in session. However, they could nonetheless get paid by their employers if they came into court and signed in.[1] The respondents do not dispute this fact but disingenuously argue that jurors who came to the court to receive credit were performing services pursuant to the direction of the court. However, by arguing to the jury, counsel admitted that some of the jurors were not present for jury service even though they were paid by their employers.

B. The effects of the court's juror policy at argument.
At trial, Allstate's main defense to the Cassims' contentions was that the Cassims had intentionally misrepresented the facts in their claim filed with Allstate. At the conclusion of the trial, the court instructed the jury on the law prior to arguments by counsel. Following the instructions, both sides proceeded with argument. In his initial argument, Cassims' counsel explained the innocent nature of any misrepresentations and emphasized Allstate's bad faith in assessing the Cassims' claim. Counsel for Allstate responded by stressing the intentional nature of the misrepresentations by the Cassims. In his final argument to the jury, counsel for the Cassims argued sometime what initially appears to be intentional misrepresentation is, in actuality, not what it seems, because of an absence of an intent to defraud. Using the "judicially excused" failure to show up to work as an example, counsel argued:
"Now, let's talk about intentional misrepresentation for a second. I think we *517 have a direct analogy to what goes on in this case. Let's think of this for a second if you would. Just think, you're at a job. You have worked at it real hard. You're a good employee. And then a new boss comes along. He doesn't like you. Maybe it's because of your sex, your race or whatever. And he discharges you. And he wrongfully discharged you. And you go get a lawyer and you sue for wrongful discharge.

"And your employer does what Allstate has done here is they look under every rock you were ever under. Look at every skeleton, everything in your life that they can use. And they go and they do a check and they say, oh, you were on jury duty in a case called Cassim. Okay. And they say you were supposed to be on jury duty but there's a couple days in which there wasn't court, but you said you were on jury duty and we paid you. That's a misrepresentation.

"[DEFENSE COUNSEL]: Your Honor I'm going to object. This is improper argument.
"[PLAINTIFF'S COUNSEL]: I don't think so.
"THE COURT: No, overruled.
"[DEFENSE COUNSEL]: And they will take something, like Allstate has done here, the mortgage file or whatever, it's even worse, what they've done here and say we have grounds now to fire you because you misrepresented about you being on jury duty on certain days and you got paid when you really weren't.
"And you say but, but, but Judge Cherness said it was okay. He says what I was doing was appropriate. And he says, no, you intentionally misrepresented. I didn't misrepresent anything. I thought that was the right thing to do.
"She said I didn't misrepresent anything. I was relying on Tony Thompson. I thought it was the right thing to do. I didn't intend to fool anybody.
"And your whole career, bang you're out.
"Isn't that what they've done here? They want to put an artificial standard on what is meant by intentional misrepresentation, a standard that would apply in a courtroom setting like this that we would never apply to ourselves. That we would not think that anything was intentional or wrong in that regard.
"But in trying to carry their burden of proof when they have this kind of flimsy crippa [sic] evidence, when they haven't done what they should have done and they're doing the lawyers' thing. They will have you now crucify these people with an extraordinary artificial interpretation of what is intentional misrepresentation and that is not fair." (Emphasis added.)

C. The argument was misconduct.
"While a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences." (Malkasian v. Irwin (1964) 61 Cal.2d 738, 747, 394 P.2d 822.) In making an argument, counsel may urge any possible theory suggested by the evidence and may even make illogical arguments as long as the arguments or theories do not misstate the law or the evidence. (Miller v. Pacific Constructors, Inc. (1945) 68 Cal.App.2d 529, 550-551, 157 P.2d 57.) In that regard counsel may even discuss the law in arguments to the jury, provided, of course that the statements of law are correct and do not conflict with the instructions given by the court. (Gotcher v. Metcalf (1970) 6 Cal.App.3d 96, 100, 85 Cal.Rptr. 566.) *518 However, deliberate attempts to inject a nonrelevant issue into a case can be misconduct. (Seimon v. Southern Pox. Transportation Co. (1977) 67 Cal.App.3d 600, 606, 136 Cal.Rptr. 787; Hoffman v. Brandt (1966) 65 Cal.2d 549, 552-553, 55 Cal.Rptr. 417, 421 P.2d 425.) Here, counsel crossed the line of permissible advocacy in two respects.

i. The Sanguinetti v. Moore Dry Dock Co. error.
First, counsel violated the rule initially set forth in Sanguinetti v. Moore, 36 Cal.2d 812, 228 P.2d 557 (1951)[2] by implying to the jury that since the court had sanctioned lying to the jurors' employers, it was permissible for the Cassims to lie to their insurance company. In its present posture the Sanguinetti rule bars counsel from arguing to the jury that some aspect of counsel's case has judicial approval. (See Neumann v. Bishop (1976) 59 Cal. App.3d 451, 130 Cal.Rptr. 786.)
In Sanguinetti, the Supreme Court held that it was misconduct for counsel to make a motion to increase the amount of damages requested, in the presence of the jury. The harm would occur when the jury later found out that motion had been granted. The court, quoting from two United State Supreme Court cases stated, "`It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.'" (Sanguinetti v. Moore Dry Dock Co., supra, 36 Cal.2d at p. 819, 228 P.2d 557.) The Sanguinetti rule has been cited in fifteen cases[3] since it was decided. It has not been the subject of a written opinion in more than 26 years.
Less than a year after deciding Sanguinetti, the court decided People v. McKay (1951) 37 Cal.2d 792, 236 P.2d 145. There, two defendants were charged with having murdered two highly regarded police officers in a rural community. Prior to trial, the only judge in town, who was very popular with the voters, had been successfully challenged by counsel for defendants. The judge then wrote a letter to the board of supervisors detailing the efforts that led to his disqualification. He attacked the motives of defense counsel and further stated that defense counsel believed the defendants were guilty. The letter was reprinted in the local newspaper and was again reprinted during jury selection. After all available challenges had been exhausted, there were still empaneled jurors who had read the letter. The Supreme Court analogized the disqualified judge to be the same as the trial judge. Then, using the Sanguinetti rule as a basis, in part, the court reversed the convictions and granted a change of venue.
In People v. Cole (1952) 113 Cal.App.2d 253, 248 P.2d 141 the defendant, while cross-examining a police officer, suggested that the officer was lying. The court, in the presence of the jury, held the defendant in contempt. In reviewing the conviction, the Court of Appeal reiterated the *519 Sanguinetti rule and its application: "Our courts have on many occasions pointed out the duty of a trial judge before a jury, both in criminal and civil cases, not to do anything which would lead the jury to believe that the judge was of the opinion that one party or the other should receive the verdict, nor to appear to throw his judicial weight on one side or the other. (People v. Mahoney [1927] 201 Cal. 618, 626-627, [258 P. 607]; Sanguinetti v. Moore Dry Dock Co., [supra], 36 Cal.2d 812, 822, [228 P.2d 557]; People v. Byrd [1948] 88 Cal. App.2d 188, 191, [198 P.2d 561]; People v. Zamora [1944] 66 Cal.App.2d 166, 209, [152 P.2d 180]; People v. Frank [1944] 71 Cal.App. 575, 581, [236 P. 189].) These cases reiterate the fact that jurors are eager to find and quick to follow any supposed hint of the judge as to how they should decide the case." (Emphasis added.) (People v. Cole, supra, 113 Cal. App.2d at p. 261, 248 P.2d 141.)
In People v. Friend (1958) 50 Cal.2d 570, 579, 327 P.2d 97, the defendant alleged that the court's constitutional power to comment on the evidence (Cal. Const., art. VI, § 19.) violated the Sanguinetti rule. The court held that nothing in Sanguinetti was intended to limit or infringe on the power of the trial court to comment on the evidence.
In People ex rel Department of Public Works v. Lundy (1965) 238 Cal.App.2d 354, 47 Cal.Rptr. 694, the Court of Appeal found Sanguinetti error in making a motion for additional damages in front of the jury, but held the error non-prejudicial. In Russell v. Geis (1967) 251 Cal.App.2d 560, 59 Cal.Rptr. 569, the court found no error because the motion had been made in chambers.
The last case to discuss the Sanguinetti rule was Neumann v. Bishop, supra, 59 Cal.App.3d 451, 130 Cal.Rptr. 786. In that case, trial counsel, in argument, engaged in what would have been misconduct, had proper objections been made. As a reviewing court, the Court of Appeal was hesitant to act in the absence of proper objections because some of the objectionable arguments could have been corrected with proper admonitions. (Id. at p. 468, fn. 3, 130 Cal.Rptr. 786.) Nonetheless, the Court of Appeal commented on counsel's argument finding that counsel had, among other things, engaged in "... the sophistry of linking his case to the judge." (Id at p. 488, 130 Cal.Rptr. 786.) The court further commented, "No objection was made to this suggestion that according to the hard-working judges the jurors were merely there to fix the amount of money to be awarded to the plaintiff." (Ibid.) After quoting Sanguinetti the court stated, "We, therefore, conclude that it is improper and misconduct for counsel to argue that his case or some aspect thereof has judicial approval." (Id at p. 485, 130 Cal.Rptr. 786.) Because the case was a clear liability case and the trial court had corrected the other errors by reducing the damages in lieu of new trial, the judgment was affirmed.

ii. The subjective argument test.
In addition to indicating judicial approval, counsel also asked the jurors to use a subjective judgment rather than rule impartially based upon the evidence. The court in Loth v. Truck-A-Way Corp. (1998) 60 Cal.App.4th 757, 765, 70 Cal. Rptr.2d 571 states: "The appeal to a juror to exercise his subjective judgment rather than an impartial judgment predicated on the evidence cannot be condoned. It tends to denigrate the jurors' oath to well and truly try the issue and render a true verdict according to the evidence. (Code Civ. Proc., § 604.) Moreover, it in effect asks each juror to become a personal partisan advocate for the injured party, rather than *520 an unbiased and unprejudiced weigher of the evidence." (See also Neumann v. Bishop, supra, 59 Cal.App.3d at pp. 484-485, 130 Cal.Rptr. 786; Sabella v. Southern Pac. Co., supra, 70 Cal.2d at pp. 319-320, 74 Cal.Rptr. 534, 449 P.2d 750.)
As in Loth v. Truck-A-Way counsel for the Cassims did not make an impermissible "golden rule argument."[4] He did something similar. He placed at least some of the jurors in the shoes of the Cassims when he thinly intimated they had committed a fraud by not going to work while collecting pay on days when the court was not in session. Counsel knowingly exploited the fact that many employers would have refused to pay for jury service on those days when the jury was not in session even though the jurors had "been given credit" for appearing. Therefore, when the jurors retired to deliberate, they were conscious of the fact that whatever else the Cassims had done, it was no worse than what the jurors, with the court's approval, had done. Whatever that conduct was, it was certainly not the type of willful misrepresentation that would void the policy. Finally, he told the jurors that it was permissible to cheat a little and that Allstate was asking them, the jurors, to impose a standard that they did not use in their normal lives. In essence, he argued that everyone, including the jurors, cheats a little and that the trial court's procedures regarding the jurors indicated the court agreed with such conduct. This argument was improper. (Cf. Seimon v. Southern Pac. Transportation Co., supra, 67 Cal.App.3d 600, 606, 136 Cal.Rptr. 787; Hoffman v. Brandt, supra, 65 Cal.2d at pp. 552-553, 55 Cal.Rptr. 417, 421 P.2d 425.) The trial court exacerbated the error when, upon proper objection, it failed to sustain the objection. By failing to act, the court gave the argument a stamp of judicial approval and compounded the error.

D. The error was prejudicial because it suggested to the jurors that the court permitted low level fraud.
Here, there is no question that the evidence presented by the Cassims was sufficient to find that Allstate had breached the covenant of good faith and fair dealing. The jury so found and, were this case before us without error, we would affirm the judgment. However, under the law, Allstate could not be guilty of bad faith unless there was a duty to perform. If the Cassims had made material misrepresentations in their claim, Allstate had the right to void the policy. (Cummings v. Fire Ins. Exchange (1988) 202 Cal.App.3d 1407, 249 Cal.Rptr. 568.)
There was more than enough evidence for the jury to find that the Cassims had made material misrepresentations to Allstate in their claim. For example, many of the receipts submitted were not authentic and contained altered numbers. At trial, the Cassims admitted filling out their own food receipts, which were sequentially numbered. There was no debris found for many of the items claimed to have been lost in the fire.
The Cassims claimed motel costs of about $1,400. Even though the Cassims claimed to have stayed at the Crest Motel in January 1991, and had receipts, there was evidence that they had stayed with relatives in Canoga Park. The registration cards were the subject of conflicting testimony. The Cassims' adjuster testified *521 that at one point Mrs. Cassim had given him the registration cards when she first retained him in January 1991. Later, the adjuster testified he had received the registration cards long after he was retained. Additionally, the handwriting on the motel receipts appeared to be the same as the handwriting on the verification letter from the Crest Motel and the sequential restaurant checks. Mrs. Cassim admitted that she had filled out the motel registration card because the man at the Crest Hotel did not want to get involved. The receipts had "Farmers Daughter" written on them, yet the Cassims purported the receipts to be from the Crest Motel. The Cassims' adjuster had testified that there was confusion between two motels because the two motels had an adjoining parking lot. However, there was other evidence the two motels were separated by several blocks and nearly one-half of a mile. There was also evidence to conclude that the rental receipts, for the summer of 1991, from the Canoga Park house were falsified. Following the fire, in the summer and fall of 1991, the Cassims submitted bills indicating they were renting a house from cousins at a rental price of $1,250 a month. However, the Cassims and their cousins originally testified that they all lived together in the house for as long as six months. That testimony changed at trial, and the cousins testified that they had moved out of their house and into a separate apartment so the Cassims could live in the house.
Additionally, Allstate also knew that at the time of the fire the Cassims were having credit problems. Their credit cards were up to their limits. Mr. Cassim was not making enough money to cover two home mortgages, the family car payments and normal living expenses. Also, the Cassims obtained their first mortgage by submitting a false tax return showing a supposed income of $76,000, when the Cassims' actual income for 1989 was $4,320. Earlier in 1990, the car leased by the Cassims had burned in the Cassims driveway one night. The lender apparently used the insurance proceeds to reduce the outstanding loan balance by $3,000. By early December 1990, the Cassims' first mortgage was delinquent. On the last business day before the fire, the Cassims' checking account had a negative balance.
In Leasure v. MSI Ins. Co. (1998) 65 Cal.App.4th 244, 248, 75 Cal. Rptr.2d 900 the court set forth the law in this area: "A fraud and concealment clause in an insurance policy generally voids the policy upon the insured's attempts to deceive the insurer. (Cummings v. Fire Ins. Exchange, supra, 202 Cal.App.3d 1407, 1414-1415, fn. 7, [249 Cal. Rptr. 568].) Deceit may involve false representations to obtain insurance coverage or to obtain benefits after a claimed loss. (Menk v. Home Insurance Co. (1888) 76 Cal. 50, 51-53, [18 P. 117] [misrepresentations in policy application concerning use of the property]; Coca Cola Bottling Co. v. Columbia Casualty Ins. Co. (1992) 11 Cal. App.4th 1176, 1187-1189 and fn. 4, [14 Cal.Rptr.2d 643] [discussing general rules concerning misrepresentations on policy applications]; Cummings v. Fire Ins. Exchange, supra, 202 Cal.App.3d 1407, [249 Cal.Rptr. 568] [insured falsely claimed unknown persons vandalized home]; Singleton v. Hartford Fire Ins. Co. (1930) 105 Cal.App. 320, 327, [287 P. 529] [insured set fire to his property and submitted false claims concerning value of property destroyed].) The validity of an insurance contract, however, is not affected by concealment or misrepresentations that do not relate to material matters. (Olson v. Standard Marine Ins. Co. (1952) 109 Cal. App.2d 130, 137, [240 P.2d 379] [insurer could not deny claim under jewelry and fur policy because insured had prostitution *522 conviction]; Cummings v. Fire Ins. Exchange, supra, 202 Cal.App.3d 1407, 1416-1417, [249 Cal.Rptr. 568] [a material representation is one relevant to the insurer's investigation of claim].)"
Here, the first issue for the jury to decide was whether the Cassims had willfully lied in their claims. Allstate had the right to have a decision made without having the jury being polluted with snide insinuations that some of them might be committing judiciallyapproved fraud. (See Hoffman v. Brandt, supra, 65 Cal.2d at pp. 551-552, 55 Cal.Rptr. 417, 421 P.2d 425.) The vice of the argument was exacerbated since it was made in rebuttal leaving counsel for Allstate no chance to respond. When counsel took the only legal avenue available, an objection, that objection was overruled. Counsel, seizing upon the opportunity presented to him, exploited the overruling of the objection by then telling the jury that the judge approved of the misrepresentation and, impliedly, that it is permissible to lie to an insurance company. Even though the jury was correctly instructed as to the applicable law, the argument was prejudicial error because it invited the jurors to set up their own standards as to what was acceptable in making insurance claims keeping in mind that some of them were in effect lying to their employers.
Neither the court nor the parties have found a case with an analogous type of argument. In many cases, the failure to object to misconduct waives the issue. The general rule was stated in Du Jardin v. City of Oxnard (1995) 38 Cal.App.4th 174, 178, 45 Cal.Rptr.2d 48. "`Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.]' " (Horn v. Atchison, T. & S.F. Ry. Co. (1964) 61 Cal.2d 602, 610, 39 Cal. Rptr. 721, 394 P.2d 561.) In evaluating claims of misconduct, "`[e]ach case must ultimately rest upon a court's view of the overall record, taking into account such factors, inter alia, as the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control, of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition under all the circumstances.' " (Sabella v. Southern Pac. Co., supra, 70 Cal.2d at pp. 320-321, 74 Cal.Rptr. 534, 449 P.2d 750, fn. omitted.)
In most of the reported cases, the misconduct permeates the trial. (See Du Jardin v. City of Oxnard, supra, 38 Cal. App.4th at p. 174, 45 Cal.Rptr.2d 48, and cases cited herein.) However, there is no inherent requirement that the misconduct be of a continuous nature. (See Hoffman v. Brandt, supra, 65 Cal.2d 549, 55 Cal. Rptr. 417, 421 P.2d 425 [admonition ineffectual where counsel implied there was no insurance and his client could not afford to pay judgment].) Here the nature of the misconduct, the time of its occurrence and the failure of the trial court to correct the error all point to the conclusion there was a miscarriage of justice. (Cal. Const., art. VI, § 13.) (See Soule v. General Motors Corp., supra, 8 Cal.4th at p. 580, 34 Cal. Rptr.2d 607, 882 P.2d 298.) Accordingly, the judgment will be reversed.
The dissent concentrates on arguments that have occurred in death penalty cases which have been found to be non-prejudicial. However, a reading of those cases makes it clear each case must be examined in light of its own facts. Thus in People v. Slaughter (2002) 27 Cal.4th 1187, 120 Cal. Rptr.2d 477, 47 P.3d 262, defense counsel failed to object for tactical reasons, even though the prosecutor had made the same argument in the first trial. The Supreme Court found the error harmless in light of the total argument and the evidence. In *523 People v. Sandoval (1992) 4 Cal.4th 155, 14 Cal.Rptr.2d 342, 841 P.2d 862, the defendant had killed four people and was being tried for all four at the same time. In spite of the improper argument the jury still deliberated almost four full days and sentenced the defendant to death on only one of the four counts. The court determined there was misconduct, but the length of the deliberations and the fact that the jury returned three sentences of life without the possibility of parole indicated the error was non prejudicial. In People v. Wash (1993) 6 Cal.4th 215, 24 Cal.Rptr.2d 421, 861 P.2d 1107, the prosecutor committed misconduct by making biblical references but then went on to make a lengthy argument based upon the facts of the case and the factors in aggravation and mitigation. Under the facts of that case the reference although improper was not reversible error. A reading of the above case and the other cases cited in the dissent makes it clear that each case must be decided on its own facts in light of the total record.
Here, in a case where fraud in an insurance claim was a primary issue in the case, counsel for plaintiff went right to the fact that the jurors had been essentially cheating their employers. When counsel made reference to the fact that some of the jurors might be accused of cheating there was no question he was letting the jurors know that the court had no objections to the procedure.[5] When the objection was sustained there was nothing else counsel could do except object again which would have had the effect of drumming home to the jury that the court thought a little cheating was permissible. Since the issue was whether plaintiffs had attempted to cheat in their claim to Allstate, the prejudice was obvious and it was prejudicial.

E. Attorneys fees pursuant to Brandt v. Superior Court.

Although we are reversing the judgment, it is necessary to discuss one issue that may arise during and after a possible retrial, should there not be a settlement.
Should a retrial occur and the jury once again find Allstate violated the covenant of good faith and fair dealing, the Cassims will be entitled to attorneys fees reasonably incurred in obtaining the policy to which they were entitled. In Brandt, the court states: "The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiffs award which exceeds the amount due under the policy are not recoverable." (Brandt v. Superior Court, supra, 37 Cal.3d at p. 819, 210 Cal.Rptr. 211, 693 P.2d 796.) Here, the trial court apparently accepted plaintiffs' argument that in the Los Angeles legal community no attorney would take on a case of this complexity for less than 40 percent of the total amounts recovered. Additionally, plaintiffs argued that it was Allstate that raised the issues of fraud in the claim and arson by plaintiffs. This position by Allstate made the breach of contract issues virtually identical with the bad faith issues. Allstate, on the other hand, argued and continues to argue here that the fees should not be more than 40 percent of the policy benefits, which in this case amounted to approximately $44,000. The trial court accepted plaintiffs' arguments and awarded attorney's fees of *524 $1,193,533. Had the court accepted Allstate's arguments, the award would have been slightly in excess of $17,000.
Allstate's position, if accepted, would force a policyholder, with limited resources, to accept whatever offer the insurance company chooses. Allstate argues that Slottow v. American Cas. Co. (9th Cir.1993) 10 F.3d 1355 supports its position. There, the court stated, "Attorney's fees, while recoverable when an insurer has acted tortuously, are limited to the amount due under the policy; fees expended on obtaining amounts in excess of the policy, such as consequential damages, aren't recoverable." (Emphasis added.) (Id at p. 1362.) That interpretation would appear to be in opposition to the trend of the law in this area.
First, there is nothing in Brandt v. Superior Court that contains such a limitation. The Brandt court stated what is involved is not the mode and manner of compensation to the attorneys, but damages wrongfully caused by the insurer's improper actions. (Brandt v. Superior Court, supra, 37 Cal.3d at p. 817, 210 Cal.Rptr. 211, 693 P.2d 796.) Second, in Croskey, California Practice Guide, Insurance Litigation (The Rutter Group 2000), section 13:30, page 13-7, the authors state "Such attorneys fees incurred by the insured may constitute economic loss, allowing recovery of emotional distress damages in first party bad faith cases." (See Waters v. United Services Auto. Ass'n. (1996) 41 Cal.App.4th 1063, 1081, 48 Cal.Rptr.2d 910.)
If an insurance company unreasonably refuses to settle a case within policy limits and a judgment in excess of the policy is obtained, the insurer is liable for the entire judgment even if the judgment exceeds the policy limits. In such a situation, the insurance company is liable for the amount of the policy under the contract of insurance and for the excess as detriment caused by the insurer's wrongful actions. Additionally, the insured can recover emotional distress damages that he or she suffered as a result of the insurer's actions. (Crisci v. Security Ins. Co. (1967) 66 Cal.2d 425, 58 Cal.Rptr. 13, 426 P.2d 173.) As Justice Peters' writing for the Crisci court stated, "[T]here is more than a small amount of elementary justice in a rule that would require that, in this situation where the insurer's and insured's interests necessarily conflict, the insurer, which may reap the benefits of its determination not to settle, should also suffer the detriments of its decision." (Id. at p. 431, 58 Cal.Rptr. 13, 426 P.2d 173.)
We believe the same reasoning applies in a situation such as this, where a trier of facts has made the determination that the insurer has engaged in bad faith with its insured. If the insurer's tortious conduct reasonably requires the insured to retain an attorney to obtain the benefits under a policy, it follows that the insurer should be liable in a tort action for that expense. (Brandt v. Superior Court, supra, 37 Cal.3d at p. 813, 210 Cal.Rptr. 211, 693 P.2d 796.)
Given the realities of complex cases, the trial court was correct in its analysis allowing attorneys' fees in excess of the policy limits and restricting the recoverable attorneys' fees to 40 percent of the compensatory damages. Punitive damages should not be taken into consideration since they are meant to punish the defendant and are a windfall to the plaintiff. (Adams v. Murakami (1991) 54 Cal.3d 105, 120, 284 Cal. Rptr. 318, 813 P.2d 1348.) Additionally, any attorney's actions in seeking information for and proving the necessary requirements for punitive damages will require more discovery and investigation than is necessary to secure the policy benefits. Finally, we have not been shown any *525 sound public policy warranting a shadow punitive damage in the form of attorneys' fees for any bad faith judgment. Thus, should the case be retried and the Cassims once again prevail, and the trial court is convinced that the "Brandt attorneys fees" exceed the policy limits, it may nonetheless make an award of the moneys actually incurred in obtaining the policy benefits.

DISPOSITION
The judgment is reversed.
Appellant to recover cost on appeal.
I concur: WOODS, J.
JOHNSON, J., Dissenting.
I respectfully dissent. Although I question whether plaintiffs counsel committed error during his jury argument, for purposes of this dissent I shall assume what he said was misconduct. The cases where appellate courts find attorneys guilty of misconduct during their jury arguments are legion. The cases where appellate courts reverse jury verdicts on that basis are few and far between. In my view, the brief analogy plaintiffs counsel used in his jury argument does not qualify as one of those rare instances warranting reversal, and thus I would affirm the judgment.

1. In either a criminal or civil case, a jury verdict should be overturned for attorney misconduct during jury argument only when it is "reasonably probable" the jury would have decided in the opponent's favor in the absence of the offending argument.
The criteria for determining whether attorney misconduct during jury argument requires reversal of a jury verdict is the same in civil as in criminal cases. Unless we can say, "after a review of the entire cause, [that it is] reasonably probable that a result more favorable to [the losing party] would have occurred had the [attorney] refrained from the comment attacked by the defendant," such conduct is not prejudicial.[1] The constitutional provision requiring affirmance unless an error or errors produced "manifest injustice" although motivated by concerns about reversals in criminal cases, nonetheless applies equally in civil cases, too.[2]
Accordingly, unless California is to have a double standard, one which is more protective of property than of life and liberty, the courts should uphold jury verdicts in civil cases as readilyand despite the same levels of prejudiceas they do in criminal cases. For that reason alone, Supreme Court opinions addressing this issue in criminal cases should represent controlling authority in civil casesand Court of Appeal decisions in criminal cases should be instructive on that question, as well.

2. Jury arguments far more prejudicial than plaintiffs counsel made in this case have been found to be harmless error in criminal cases.
In a series of recent cases, culminating in People v. Slaughter,[3] the California Supreme Court has criticized prosecutors for quoting the Bible in support of the death penalty, thereby lining up God against defendants in capital cases. Yet in none of those cases did the Supreme Court find this misconduct alone sufficiently prejudicial *526 to justify reversal, even though the consequence of that finding meant death for the defendant involved.
In most cases, these were not off-hand quotations of single Biblical passages. In Slaughter, for example, the prosecutor told the jury:
"`The ruler bears not the sword in vain for he is the minister of God, a revenger to execute wrath upon him that doeth evil.' He's [the apostle Paul] talking about the government.
"You go back to the Old Testament, the first five books, I believe the Old Testament is the Jewish Torah. In any event, the Judeo Christian ethic comes from the Old Testament, and in Genesis, the very first book of the Bible, the scripture says, 'Adam, human being, whoever sheds the blood of man by man shall his blood be shed, for in his image did God make man.'
"There are two important concepts there. Capital punishment for murder is necessary in order to preserve the sanctity of human life and only the severest penalty of death can underscore the severity of taking life.
"There are several other passages in the Bible that talk about the death penalty or death, not referred to in the Bible as the death penalty, but the one that I find quite interesting is Exodus, chapter 21 verses 12 through 14. It says, `Whoever strikes another man and kills him shall be put to death. But if he did not act with intent, but they met by act of God, the slayer may flee to a place which I will appoint for you.'
"This is the Lord speaking, and he's saying, if you believe in that particular religion, he's saying, `if you didn't do this intentionally, there's a sanctuary for you where nobody can harm you.' I suppose its something like life without possibility of parole.
"But it goes on to say, `If a man has the presumption to kill another by treachery, you shall take him even from my altar, to be put to death.' In other words, there's no sanctuary for somebody that kills by treachery, an intentional, cold-blooded killer. You can take him from the altar and he shall be put to death.
"Now, again, I don't give that to you in aggravation because it's not. Just if you have any religious considerations at all that are bothering you or concerning you, that's just for your use."
Unless the Slaughter jury was made up of atheists, highly unlikely at best, it is hard to imagine a more direct plea to the jurors they had a moral, indeed religious, duty to vote for the death penalty in this case. Quoting from People v. Wrest,[4] the Supreme Court explained why this represented error. "`[T]he prosecutor's reference to Old Testament support for capital punishment was impropersuch an argument tends to diminish the jury's sense of responsibility for its verdict and to imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions.'"[5] Nonetheless, as it had done in Wrest, the Supreme Court majority agreed "with the People that the biblical references, although improper, were harmless."[6] Our high court also had *527 found it harmless error for prosecutors to invoke the word of God in support of the death penalty in People v. Sandoval[7] and People v. Wash[8] Only in People v. Hill[9] did the Supreme Court reverse a death penalty where the prosecutor referred to the Bible, and then only because that reference was "part of a pattern of `serious, blatant and continuous misconduct at both the guilt and penalty phases of trial' that, together with other errors, required reversal of the judgment." [10]
These "biblical reference" cases suggest the degree of prejudice California courts will tolerate before finding an erroneous jury argument so prejudicial it warrants reversal of a jury verdict. The Supreme Court also has found harmless many other jury arguments the Court deemed to represent prosecutorial misconduct in criminal cases. A few examples will suffice.
In several cases, the Supreme Court has found misconduct when a prosecutor appealed to the jury's passions by asking them to imagine themselves or a loved one in the shoes of the victim. Yet repeatedly the Court found this misconduct to be harmless error. In People v. Pensinger,[11] a death penalty case, the prosecutor told the jury to imagine it was their five-month old infant who had been murdered. In People v. Stansbury,[12] another death penalty case, the prosecutor told the jury to imagine what the 10-year-old victim was "thinking in her last moments of consciousness" and how she "might have begged or pleaded or cried." In a third death penalty case, People v. Fields,[13] the prosecutor asked the jurors to imagine they were a young librarian tied to a bed pole, naked, and threatened with death, then shot, beaten and lingering in pain for 10 or 15 minutes before dying. And, in People v. Lambert,[14] an appellate court disapproved a prosecutor's argument telling the jurors the defendant was less credible than the prosecution witnesses because he entered through a holding cell door and had lied to them so they would acquit him and thus allow him to go out on the street and shoot somebody else.[15]
In refusing to reverse despite these erroneous jury arguments the Supreme Court emphasized factors such as the objectionable appeals to the jury's passions were isolated pieces of the overall argument,[16] or "must be viewed in context" of a *528 lengthy and complex closing,[17] or the evidence was sufficient for the jury to decide as it did.[18] The Court of Appeal in People v. Lambert merely observed the "jury obviously believed" the prosecution witnesses instead of the defendant and would have decided that way even without the clearly improper arguments of counsel.[19]

3. It is not reasonably probable the jury would have returned with a defense verdict had plaintiffs counsel not included the single analogy he did in his closing statement to the jury.
With the above jury arguments in mind and recalling the California courts found all of them harmless error and refused to reverse the jury verdicts, we now turn to the critical part of the jury argument in the before this court. The full argument Allstate claims is reason enough to throw out the jury verdict in this six-week-long trial is quoted in the majority opinion (Maj. Opn. at pp. 516-517.) So I will not repeat it here. But I do emphasize it takes up less than 2 pages of transcript out of over 130 pages of closing argument by plaintiffs counsel in this six-week trial.
If Allstate's objection is to the analogy about jurors reporting for duty on days the jury was not sitting as a way of emphasizing the intent element of misrepresentation, it is difficult to conclude this jury argument represented misconduct. The analogy between the sort of misrepresentation Allstate emphasized in its own jury argument and that which plaintiffs counsel pointed to here may not have been perfect. But it certainly was close enough to be within the realm of reasonand reasonable comment during a jury argument.
Furthermore, the analogy could have cut the other way, at least for any juror who believed the evidence of plaintiffs alleged intentional misrepresentations the majority underscores in its opinion. (See Maj. Opn. at pp. 520-521.) Such jurors would have every reason to be offended by any suggestion what they did or saw done in the courtroom was in any way comparable to the despicable conduct this evidence portrayed. Thus, they would have been motivated to vote for the defense. Only if they disbelieved the majority of the defense evidence about plaintiffs' alleged misrepresentations would the jurors be inclined to see an analogy between what happened in the courtroom and what they believed plaintiffs, in fact, did. Thus, it is pure speculation this particular argument was prejudicial to the defendant rather than the plaintiffand depends primarily on the jury's assessment of the evidence. If they believed plaintiffs' evidence the analogy may have helped plaintiffs. But had they believed defendant's evidence about plaintiffs' misrepresentations the analogy would not have helped plaintiffs and might have hurt them.[20]
On the other hand, if Allstate's main objection is to counsel's express mention of the trial judge's approval of this practice, Allstate's counsel failed to object to that part of plaintiffs' statement. The earlier general objection to the use of the analogy *529 itself was not an objection to invoking the judge's name and prestige as somehow supporting plaintiffs' position, which appears to be Allstate's position on appeal. That failure to object specifically on this ground is itself a sufficient reason to find any error harmless. As has been stressed time and again, a specific and timely objection allows the trial court the opportunity to condemn an improper argument and admonish the jury to disregard it. Here a strong admonishment, had Allstate's counsel objected and the trial court agreed it was error, would have withdrawn any appearance the judge endorsed plaintiffs' argument and thus completely cured the error Allstate now urges so vigorously on appeal. Without such an objection, the misconduct, if any, is waived.[21]
The majority opinion argues we should overlook this failure to object, suggesting it would have been a futile act because the trial court already had overruled appellant's objection to the use of the analogy itself. In my view, this too is mere speculation. The nature of the objection to invoking the judge's name and prestige is far different from the earlier objection to using the analogy about how jury duty was reported. The judge could easily have overruled appellants' objection to the latter but sustained an objection to the former. But he was not given the opportunity, because appellant failed to object.
But even assuming Allstate's counsel had objected to invoking the judge's name and the trial court had overruled that objection, and further assuming this were error, it would not have represented error sufficient to warrant reversal of the jury verdict in this case. Compared to many of the jury arguments the California Supreme Court and Courts of Appeal found harmless error in the cases discussed earlier in this opinion, what plaintiffs counsel did in this case borders on the de minimis.
Several of those casesincluding those discussed in the majority opinion (see Maj. Opn. at pp. 522-523) emphasized the offensive argument, whatever it might be, represented only a small part of the counsel's overall jury presentation.[22] Here the mention of the trial judge and indeed the entire jury service analogy is but a tiny piece of the lengthy closing argument plaintiffs' counsel delivered in this casenot even 2 pages out of 131. Those cases conclude any influence the faulty argument might have had would have been overwhelmed by the legitimate arguments surrounding it. If this is true in these other cases, it certainly is true here.
Other of these cases explain it is unlikely the objectionable argument was so persuasive it was the reason the jury voted in support of the misbehaving counsel's position.[23] Here it is equally unlikely this single analogy (including a truthful observation the trial judge approved the treatment of the jury's off-days) actually tipped the balance in a six-week trial. This is very unlike Sanguinetti,[24] on which All-state *530 relies, w here the plaintiffs lawyer moved to raise the damage claim by 50 percent in front of the jury and the judge endorsed that higher damage request by granting it. There the judge could be perceived to be directly endorsing increased damages for the plaintiff. And as if to confirm this view, the jury in that case returned the precise amount of the damage claim the judge had endorsed.
In the case before this court, the judge did not directly endorse a finding what the plaintiffs did and said during the transactions the jurors heard about during the trial failed to constitute "intentional misrepresentations." What the court endorsed, to the extent it endorsed anything, was permission for the jurors to claim jury service for days the court was not in session. This is far removed in the chain of logic from endorsement of the plaintiffs' ultimate position in this case.[25] Compared to the repeated references to God's direct endorsement of the death penalty in cases like People v. Slaughter, it is much less likely this one reference to the trial judge produced a jury verdict different from what would have been forthcoming had plaintiffs' counsel omitted those two words from his closing.
Taking into account "the nature and seriousness of the remarks and misconduct, the general atmosphere, including the judge's control of the trial, the likelihood of prejudicing the jury, and the efficacy of objection or admonition [had appellant objected to mention of the judge's alleged 'approval']",[26] I conclude the analogy drawn by plaintiffs counsel here, if error, was not error sufficient to justify reversal of this jury verdict. The lawyer's "remarks" were temperate, not hot-headed, aimed at the jurors' reasonnot to arouse their passions. The general atmosphere of plaintiffs' closing and the trial judge's control of jury argument and the rest of the trial were calculated to contribute to the jury's rational consideration of the issues. Moreover, to the extent counsel's reference to the trial judge's apparent approval of the practice of jurors signing in for days the court was not in session constituted misconduct, it was misconduct eminently curable through admonitionif only Allstate's counsel had objected at that time and on that basis.
On balance, I find it impossible to find it "reasonably probable" that had plaintiffs counsel omitted this entire analogy from his closing argument, or had omitted the reference to the trial judge, the jury would have found for the defendant. As the majority opinion concedes, ample evidence and reasons supported the verdict the jury did reach and, in my view, it appears highly unlikely this analogy was needed to turn the tide in plaintiffs' direction. In essence, Allstate is asking us to reverse this jury verdict for what is contained on less than 2 pages out of over 15, 000 pages of transcript in this trial. Worse, the real objection appears to be for only two words, "Judge Cherness," out of several hundred thousand words uttered during the six weeks the jury was hearing this case.
*531 This case offered the trial judge an almost unique aid in evaluating the likely prejudicial effect of the alleged misconduct by plaintiffs' counsel. The record contains extensive declarations from all 12 jurors. Among them, these 12 declarations report every statement any jury member uttered suggesting any conceivable improper influence or error in reasoning.
Appellants relied almost exclusively on these jury declarations in justifying their JNOV and new trial motions and argued at length the statements revealed the deliberations were rife with improper influences and defective reasoning. Yet in their oral argument on these motions appellant's counsel did not even mention this jury argument issue as one of the errors reflected in the jury deliberations warranting JNOV or a new trial.[27] And this is not surprising in view of the short shrift given this topic during the jury declarations. The two minority jurorsthis was a 10-2 verdict on most questions in the special verdict formsubmitted identical jury declarations recounting in one brief paragraph (out of 31 numbered paragraphs) how they told the other jurors they thought it was improper argument and several other jurors disagreed with them. In their declarations, some of the majority jurors reported this same dispute but stated no one said the argument meant it was permissible to lie to Allstate. These jurors reported the focus of the discussion was on the evidence and whether the Cassims in fact made intentional misrepresentations to Allstate and not on whether the judge or the practice respondents' counsel mentioned somehow implied approval of lying to Allstate.
As an appellate court, we are admonished the "[trial] judge is in a better position than an appellate court to determine whether the verdict is due wholly or partially to misconduct of counsel and his conclusion will not be disturbed unless under all the circumstances it is plainly wrong."[28] Here, the trial judge had before him not only the usual information useful in evaluating the impact of an erroneous jury argument but also declarations from all 12 jurors about what occurred during their deliberations. This put the trial court in a nearly unique position to assess whether this single analogy respondents' counsel mentioned during his closing played such a critical role in the jury's discussions the judge could rightly say "[it is] reasonably probable that a result more favorable to [the losing party] would have occurred had the [attorney] refrained from [introducing this analogy]."[29] In my view, the trial judge's rejection of Allstate's claim of prejudicial error was plainly right, but in any event it certainly was not plainly wrong.
For all these reasons, were I in the majority I would affirm the jury verdict and the judgment in this case.
NOTES
[*] Judge of the Los Angeles Superior Court, Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] The court is aware that many employers expect employed jurors to return to work on days when the courts are not in session. See Robinson v. United States (1984) 5 Cl.Ct. 130.
[2] Violations of the Sanguinetti v. Moore Dry Dock Co. will be referred to as violations of the Sanguinetti rule.
[3] In addition to the cases discussed, it has been cited in the following cases: Leipert v. Honold (1952) 39 Cal.2d 462, 247 P.2d 324; Sabella v. Southern Pac. Co. (1969) 70 Cal.2d 311, 74 Cal.Rptr. 534, 449 P.2d 750; Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 882 P.2d 298; Lawson v. Town & Country Shops, Inc. (1958) 159 Cal. App.2d 196, 323 P.2d 843; Adam v. Los Angeles Transit Lines (1957) 154 Cal.App.2d 535, 317 P.2d 642; Ching v. Foon (1956) 143 Cal. App.2d 129, 299 P.2d 668; Trainor v. Maus (1954) 126 Cal.App.2d 295, 271 P.2d 957.
[4] An argument by which counsel asks the jury to place itself in the victim's shoes and award such damages as they would charge to under-go equivalent pain and suffering. See Beagle v. Vasold (1966) 65 Cal.2d 166, 182, footnote 11, 53 Cal.Rptr. 129, 417 P.2d 673.
[5] The court's intention to treat the jurors kindly had the effect of making cheating palatable and denied Allstate a fair trial on the issue of fraud. See People v. Mello (2002) 97 Cal.App.4th 511, 118 Cal.Rptr.2d 523.
[1] People v. Beivelman (1968) 70 Cal.2d 60, 75, 73 Cal.Rptr. 521, 447 P.2d 913 (emphasis supplied.)
[2] 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 438, and cases cited therein.
[3] People v. Slaughter (2002) 27 Cal.4th 1187, 120 Cal.Rptr.2d 477, 47 P.3d 262.
[4] People v. Wrest (1992) 3 Cal.4th 1088, 13 Cal.Rptr.2d 511, 839 P.2d 1020.
[5] People v. Slaughter, supra, 27 Cal.4th at page 1210, 120 Cal.Rptr.2d 477, 47 P.3d 262, quoting from People v. Wrest (1992) 3 Cal.4th 1088, 1107, 13 Cal.Rptr.2d 511, 839 P.2d 1020.
[6] People v. Slaughter, supra, 27 Cal.4th at page 1210, 120 Cal.Rptr.2d 477, 47 P.3d 262. This "harmless error" finding prompted a sharp dissent from Justice Kennard, joined by Justice Moreno. After criticizing earlier California Supreme Court authority which found biblical references to be harmless error, and citing a federal circuit court opinion which held otherwise (Romine v. Head (11th Cir. 2001) 253 F.3d 1349, 1371), the dissent concludes, "I cannot say with reasonable confidence that the jury would have returned the death verdict if the prosecutor had refrained from making ... an improper jury argument appealing to religious authority as mandating the death penalty." (27 Cal.4th at pages 1228-1229, 120 Cal.Rptr.2d 477, 47 P.3d 262.)
[7] People v. Sandoval (1992) 4 Cal.4th 155, 193-194, 14 Cal.Rptr.2d 342, 841 P.2d 862, affirmed on another ground sub nomine Victor v. Nebraska (1994) 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583.
[8] People v. Wash (1993) 6 Cal.4th 215, 261, 24 Cal.Rptr.2d 421, 861 P.2d 1107.
[9] People v. Hill (1998) 17 Cal.4th 800, 836, 72 Cal.Rptr.2d 656, 952 P.2d 673.
[10] People v. Slaughter, supra, 27 Cal.4th at page 1211, 120 Cal.Rptr.2d 477, 47 P.3d 262.
[11] People v. Pensinger (1991) 52 Cal.3d 1210, 1250, 278 Cal.Rptr. 640, 805 P.2d 899.
[12] People v. Stansbury (1993) 4 Cal.4th 1017, 1057, 17 Cal.Rptr.2d 174, 846 P.2d 756.
[13] People v. Fields (1983) 35 Cal.3d 329, 361-362, 197 Cal.Rptr. 803, 673 P.2d 680.
[14] People v. Lambert (1975) 52 Cal.App.3d 905, 125 Cal.Rptr. 404.
[15] People v. Lambert, supra, 52 Cal.App.3d 905, 910, 125 Cal.Rptr. 404.
[16] People v. Pensinger, supra, 52 Cal.3d 1210, 1250, 278 Cal.Rptr. 640, 805 P.2d 899.
[17] People v. Stansbury, supra, 4 Cal.4th 1017, 1057, 17 Cal.Rptr.2d 174, 846 P.2d 756.
[18] People v. Fields, supra, 35 Cal.3d 329, 363, 197 Cal.Rptr. 803, 673 P.2d 680.
[19] People v. Lambert, supra, 52 Cal.App.3d 905, 911, 125 Cal.Rptr. 404.
[20] A review of the juror declarations indicates the majority of jurors examined the evidence closely during deliberations and concluded the Cassims had not misrepresented in their submissions to Allstate and any misrepresentations in their loan application were irrelevant as proof they lied to Allstate.
[21] See, e.g., Neumann v. Bishop (1976) 59 Cal.App.3d 451, 130 Cal.Rptr. 786 [dismissing most claims of misconduct during jury argument because opposing counsel failed to object].
[22] See, e.g., People v. Pensinger, supra, 52 Cal.3d 1210, 1250, 278 Cal.Rptr. 640, 805 P.2d 899; People v. Stansbury, supra, 4 Cal.4th 1017, 1057, 17 Cal.Rptr.2d 174, 846 P.2d 756; and People v. Fields, supra, 35 Cal.3d 329, 363, 197 Cal.Rptr. 803, 673 P.2d 680.
[23] People v. Fields, supra, 35 Cal.3d 329, 363, 197 Cal.Rptr. 803, 673 P.2d 680; People v. Lambert, supra, 52 Cal.App.3d 905, 911, 125 Cal.Rptr. 404.
[24] Sanguinetti v. Moore Dry Dock Co. (1951) 36 Cal.2d 812, 228 P.2d 557. This was a 4-3 decision which elicited an unusually vitriolic dissent accusing the majority of creating a rule out of whole cloth one completely inconsistent with prior precedent and having done so for the basest of motives. (36 Cal.2d at pp. 823-845, 228 P.2d 557.)
[25] Several juror declarations stated the trial judge did not endorse or otherwise favor the plaintiffs' case but was viewed by all jurors as neutral and balanced. These declarations are inconsistent with a finding the jury viewed the trial judge's approval of this treatment of off-days as some sort of endorsement of respondents' case.
[26] Sabella v. Southern Pac. Co. (1969) 70 Cal.2d 311, 320-321, 74 Cal.Rptr. 534, 449 P.2d 750.
[27] This issue was mentioned briefly in the written motions, however, along with a score of other issues appellant claimed to require JNOV or a new trial.
[28] Neumann v. Bishop, supra, 59 Cal.App.3d 451, 492, 130 Cal.Rptr. 786 (emphasis supplied).
[29] People v. Beivelman, supra, 70 Cal.2d 60, 75, 73 Cal.Rptr. 521, 447 P.2d 913 (emphasis supplied).